

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| DENNIS SMITH, Individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC., PERSONNEL & COMPENSATION COMMITTEE, EDWARD H. BUDD, DAVID R. GOODE, GEORGE M.C. FISHER, GERALD GRINSTEIN, KENNETH B. WOODROW, LEON PIPER and HANK HALTER<br><br>Defendants. | **ORIGINAL**<br><br>Civil Action No.<br><br>CLASS ACTION **1  04-CV  2592**<br>Jury Trial Demanded<br><br>**GET** |

Plaintiff Dennis Smith ("Plaintiff" or "Smith"), a participant in the Delta Family-Care Savings Plan (the "Delta Plan" or the "Plan"), on behalf of himself and a class of all others similarly situated, alleges as follows:

### INTRODUCTION

1.    This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Defendants, fiduciaries of the Plan.

2.    401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio. Common stock of Delta Air Lines, Inc. ("Delta" or the "Company") is one of the investment alternatives of the Plan.

3.    Plaintiff was employed with Delta during the Class Period (defined below). Plaintiff's retirement investment portfolio includes Delta stock.

4.    Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to him and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Delta stock.

5.    Defendants offered Company stock as an investment alternative for the Plan during the Class Period despite their knowledge, actual or constructive, that such investments were imprudent due to the Company's dire financial position.  Therefore, during the Class Period, Defendants knew or should have known that Delta stock was an imprudent investment alternative for the Plan, either for individual or Company matching contributions.

6.    Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## PARTIES

**Plaintiff**

9.    Plaintiff Dennis Smith ("Smith") worked for Delta, is a participant in the Delta Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and continues to hold Delta shares in his retirement investment portfolio.

**Defendants**

**Delta**

10.     Delta Air Lines, Inc. ("Delta"), headquartered in Atlanta, Georgia, provides air transportation for passengers and freight throughout the United States and the world. Delta is the third largest carrier in both the U.S. and the world, behind only United Airlines and American Airlines. Delta operates domestic hubs in Atlanta, Cincinnati, Dallas-Forth Worth and Salt Lake City, with its international hubs being Atlanta and New York's JFK airport. Delta, including through its wholly owned subsidiaries, Atlantic Southeast Airlines, Inc. ("ASA") and Comair, Inc. ("Comair"), serves 204 domestic cities in 46 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, as well as 52 international cities in 34 countries. The Company is managed as a single business unit.

11.     Delta is the Delta Plan's Sponsor and, upon information and belief, a Named Fiduciary of the Delta Plan within the meaning of ERISA and the Delta Plan's Administrator as that term is defined under the statute. Further, the Company exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Delta at all times acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any Delta oversight and/or Plan administrative committees, appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

12.     Delta had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities. Through its Board of Directors or otherwise, Delta had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, the Board of Directors also

had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, the officer and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries. Accordingly, the actions of the Board of Directors, the Plan's committees and/or any other employee fiduciaries are imputed to Delta under the doctrine of *respondeat superior*, and Delta is liable for these actions.

**Director Defendants**

13.     As explained below, a subcommittee of the Company's Board of Directors, the Personnel & Compensation Committee, was responsible for oversight of the Company's "equity-based plans for Delta employees" and to "oversee the activities of the individuals and committees responsible for administering" those plans. *See* Delta 2004 Proxy Statement. Consequently, the Personnel & Compensation Committee and its members, upon information and belief, were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

14.     Defendant Edward H. Budd ("Budd") served on Delta's Board of Directors during the Class Period. In addition to serving on the Company's Board, Defendant Budd also served on the Board's Personnel & Compensation Committee.    Hence, Defendant Budd, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

15.     Defendant David R. Goode ("Goode") served on Delta's Board of Directors during the Class Period. In addition to serving on the Company's Board, Defendant Goode also

served on the Board's Personnel & Compensation Committee.  Consequently, Defendant Goode, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.

16.     Defendant George M.C. Fisher ("Fisher") served on Delta's Board of Directors for at least part of the Class Period.  In addition to serving on the Company's Board, Defendant Fisher, from 2000 to 2003, served on the Board's Personnel & Compensation Committee. Consequently, Defendant Fisher, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.

17.     Defendant Gerald Grinstein ("Grinstein") served on Delta's Board of Directors during the Class Period.  In addition to serving on the Company's Board, Defendant Grinstein also served on the Board's Personnel & Compensation Committee for at least the period from 2000-2002.  Hence, Defendant Grinstein, upon information and belief, was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.  In addition, as more fully explained below, Defendant Grinstein was appointed the Company's Chief Executive Officer ("CEO") in January 2004.

18.     Defendant Kenneth B. Woodrow ("Woodrow") was elected to Delta's Board of Directors in 2004.  In addition to serving on the Company's Board, Defendant Woodrow also serves on the Board's Personnel & Compensation Committee for 2004.   Consequently, Defendant Woodrow, upon information and belief, was a fiduciary of the Plan within the

meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.

**Non-Director Defendants**

19.     Defendant Leon Piper ("Piper") for at least a portion of the Class Period was Delta's Vice-President - Worldwide Benefits and Health Resources.  In addition, Defendant Piper signed, as Plan Administrator, the Company's Form 5500 annual reports for years ending June 30, 2001 and December 31, 2001 for the Delta Plan.  Upon information and belief, Defendant Piper was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.

20.     Defendant Hank Halter ("Halter") for at least a portion of the Class Period was Delta's Vice-President - Finance and Assistant Controller.  In addition, Defendant Halter signed, on behalf of Delta, the Company's Form 5500 annual reports for years ending June 30, 2001 and December 31, 2001 for the Delta Plan.  Upon information and belief, Defendant Halter was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plans assets.

21.     Defendants Piper and Halter are hereafter collectively referred to as the "Individual Defendants."

22.     Upon information and belief, there are additional fiduciaries of the Plan whose identities are currently unknown to Plaintiff.  These individuals may include additional Delta employees.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE DELTA PLAN

23.    Delta's Plan, the Delta Family-Care Savings Plan, is a defined contribution plan that assists substantially all Delta, Delta Technology, Inc. ("Delta Technology") and Song Airways, LLC ("Song") employees in saving for their retirement.

24.    At the participant's choosing, contributions to the Plan are made on either a pre-tax or after-tax basis, or some combination thereof.  Participants who are not pilots may contribute up to thirty-five percent of their earnings to the Plan.[1]

25.    The Delta Plan offers the following investment options to Plan participants: mutual funds, a brokerage window, and several actively managed portfolios, including the Delta Common Stock Fund which invests primarily in the Company's common stock.[2]  The Delta ESOP ("Employee Stock Ownership Plan") Stock Fund is closed to participant directed investment options and consists of only Company directed contributions.

26.    The brokerage window, which allows Plan Participants to diversify their holdings through alternative investment strategies, was added to the Delta Plan effective October 1, 2001.

27.    In addition to their holdings in the Delta ESOP Fund, a maximum of fifty percent of Plan participants' contributions can be invested in the Delta Common Stock Fund.

28.    The first $1,700[3] of Company matching contributions for Delta and Delta Technology Plan participants are invested in the Delta ESOP Stock Fund and any matching contributions over this amount are invested in the same proportion as the Plan participant directs

---

[1]  Prior to September 1, 2002 this amount was limited to 23% for Delta employees and 18% for Delta Technology employees.  As explained below, Song was not launched until 2003.

[2]  During the Class Period the Delta Common Stock Fund was also comprised of a small cash or money market component.

[3]  At the start of the Class Period, this Company matching contribution was $1,500.  However, it was increased by $50 each subsequent year during the Class Period.

his/her own contributions. The Delta ESOP Stock Fund consists of both Delta Common Stock and Delta Series B ESOP Convertible Preferred Stock ("Preferred Stock").

29.    Delta Plan participants are immediately invested in all contributions to their accounts.

30.    Delta and Delta Technology non-pilot participants, after completing twelve months of service, are eligible to receive monthly Company matching contributions of fifty cents for every dollar contributed by the Plan participant, up to two percent of the participant's monthly earnings. Prior to October 2002, Company matching contributions were made on a quarterly basis.

31.    Delta Technology Plan participants who do not meet the Plan definition of "highly compensated" employees are eligible to receive, on an annual basis, an additional employer contribution equal to five percent of their earnings.

32.    Delta Technology participants are immediately invested in both their contributions and Company matching contributions except for the Company's annual profit-sharing contribution which has a three year vesting period.

33.    Delta pilots, who participate in the Plan and who do not qualify as "highly compensated" pilots as defined in the Plan, are able to contribute up to eighteen percent of their earnings, while highly compensated pilots can contribute up to thirteen percent of their earnings to the Plan.

34.    Delta pilots are immediately eligible for employer contributions, totaling three percent of their monthly earnings.

35.    Employees of Song, who were either employees of Song on April 1, 2003 or have completed twelve months of service, are eligible to receive a dollar for dollar matching

8

contribution from the Company, up to three percent of the participant's earnings. In addition, Song participants are also eligible to receive an additional match of fifty percent of all additional contributions up to six percent of the participant's earnings.

36. Song employees who qualify under the Plan as "Founders" are eligible to receive, on an annual basis, an additional employer contribution called the "Founders contribution" totaling three percent of their earnings.

37. Song participants who qualify as Founders are immediately invested in the Plan. Members who do not qualify as Founders become vested after three years of service.

**Delta's ESOP**

38. In addition to its traditional 401(k) portion, the Delta Plan also includes a leveraged ESOP. In establishing the ESOP in 1989, Delta sold 6,944,450 shares of preferred stock to the ESOP for $72 per share or approximately $500 million total. Shares of preferred stock are released from the ESOP and allocated to each of the participants' accounts.

39. If the amount of preferred stock released is less than the amount the Company is required to contribute to the Plan from either the Company matching requirements or non-elective contribution requirements, Delta will make up the difference through (i) releasing additional shares of preferred stock, (ii) contributing cash to the Plan so that the Plan trustee can purchase Delta common stock, or (iii) contributing Company common stock directly to the Plan.

40. The Delta Plan's Trustee is Fidelity Management Trust Company ("Fidelity").

## DEFENDANTS' FIDUCIARY STATUS

41. During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

9

42.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to 3(21)(A) of ERISA, 29 U.S.C. 1002(21)(A), and the law interpreting that section.

43.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Plan's documents describe Delta, the "Personnel & Compensation Committee" and/or another committee as a named fiduciary(ies) of the Plan.

44.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Delta chose to internalize at least some of these fiduciary functions.

45.    Upon information and belief, the Plan and their assets are administered and managed by "Committees" selected and monitored by, upon information and belief, Delta's Board of Directors ("Board") *en toto* or the Personnel & Compensation Committee of the Board of Directors acting on behalf of the Board at large.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

46.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions. Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

47.    During the Class Period, Delta's direct and indirect communications with the

10

Plan's participants included statements about the Company and its stock which caused Plaintiff and members of the Class to purchase, and to hold and maintain, investments in Delta stock, and to accept at face value investments in Delta's stock. These communications included, but were not limited to, Company SEC filings, annual reports, and press releases. The Company, and the individuals acting on the Company's behalf who provided this information to participants, encouraged participants to review the information in these communications when evaluating the merits of investment in Delta's stock and also acted as fiduciaries to the extent of this activity.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between November 14, 2000 and August 9, 2004 (the "Class Period") and whose accounts included investments in Delta stock.

49.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

11

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

54.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

**DEFENDANTS' CONDUCT**

**A.      Delta Stock Was an Imprudent Investment for the Plan**

**A Brief History of Delta**

55.      Throughout the 1990s, Delta was one of the stars of the airline industry.

56.      In 1991, the Company purchased substantially all of the defunct Pan Am's transatlantic routes, the largest acquisition of flights in airline history.

57.      In the fourth quarter of 1994, Delta returned to profitability.  Delta continued this upward trend throughout the rest of the decade.  In fact, every year from 1997 through 2000, Delta's revenue increased a minimum of 5%, with no drops reported from 1997-2000.

58.      In 1997, Delta became the first airline to board over 100 million passengers in a year.

59.      Unfortunately for the Plan's participants and as described below, Delta was unable to adapt to the changing market environment and suffered from numerous problems, including an inability to control rising costs, the vanishing "road warrior" business traveler and the rise of discount airlines.  In addition, Delta was losing ground to its competitors.  Indeed, between 2001 and 2003, Delta lost on average over a billion dollars a year and its stock steadily declined.

**Competition From Discount Airlines**

60.      One of the biggest obstacles to Delta and the other major airlines was the rise of the discount airlines.  Unlike the discount airlines, the major airlines were saddled with numerous problems including (i) less productive labor contracts and typically, older, more highly

compensated employees, (ii) older, less fuel efficient planes, (iii) higher pension plan expenses, and (iv) a high debt to equity ratio. Consequently, discount airlines are able to operate more efficiently and offer cheaper airfare to gain market share.

61.    At the six largest airlines, passenger traffic was down eight percent, or 2.9 billion revenue passenger miles, for June 2004 as compared to June 2001. A revenue passenger mile is one paying passenger flown one mile. Comparatively speaking, the six largest discount airlines flew three billion, or thirty-eight percent, more revenue passenger miles during the same time period.

62.    According to the Transportation Department Inspector General's office, low-cost airlines expanded their market share roughly six percent from May 2000 to May 2004. Consequently, discount airlines' domestic market is now twenty-five percent, up from approximately 18 to 19 percent.

63.    As such, traditional airline carriers now face discount-airline competition on at least seventy percent of their domestic routes. Moreover, these traditional carriers have lost the ability to raise prices, even when traffic is strong on a route. Indeed, AirTran, with their largest hub located in Atlanta (which is also Delta's main hub), is expected to earn over $1 billion in passenger revenue this year, making it a "major" airline according to the Transportation Department's calculations.

64.    Delta in particular has faced increasing competition from discount airlines, including AirTran, along with expanding operations by JetBlue Airways and SouthWest Airlines, both of which have increasingly moved into Delta's eastern United States markets.

65.    According to an article appearing in the August 17, 2004 edition of the *Wall Street Journal*, this competition has caused Delta to slash its prices in order to maintain market

share. For instance, when America West began offering flight service from JFK to Los Angeles ("LAX") – one of the most traveled traffic routes in the industry -- in October 2003, it immediately undersold Delta, offering last minute tickets for as low as $598 compared with Delta's price of over $1,800. Responding to this price competition, major airlines, including Delta, began cutting their prices and revamping their overall price structure. Consequently, from June 2001 to June 2004 the average round-trip price for a JFK-LAX ticket fell 42%.

**Post 9/11 Measures and Discount Airlines Gain Ground**

66.    Although the value of Delta's stock had dropped significantly from the start of the Class Period to just prior to September 11, 2001, closing at $37.25 on September 10, 2001 and representing a **25.13% drop in value since the start of the Class Period**, the Defendant-fiduciaries failed to take any ameliorative measures to protect the Plan's participants. This is in spite of the fact that, as described herein, the Company's mounting problems -- including its escalating costs and rising competition -- were well documented by Delta itself. Consequently, even prior to 9/11, the Plan, and concomitantly its participants, lost significant amounts of retirement savings.

67.    Unfortunately for the Plan's participants, even in the post-9/11 world, the Defendants failed to protect their interests or, upon information and belief, adequately advise them of the significant risk to their retirement savings.

68.    In a *Reuters* article, published August 12, 2004, the major airlines, including Delta, American Airlines and United Airlines, had told Congress that they planned to save $19.5 billion between October 2001 and December 2003. However, the actual savings during this time period, the "industry's worst-ever downturn," was only $12.7 billion or a 14.5% reduction in operating expenses.

69.    The article also noted that discount airlines saw a 9.4% increase in their operating revenues, while the major airlines saw a 14.5% drop in their operating revenues, further pressuring the major airlines, including Delta, to save money.

70.    Indeed, in an August 20, 2004 article appearing on *TheDeal.com*, analysts speculated that the billions of dollars in government aid given to the major airlines after September 11, 2001 might have done nothing but delay the inevitable demise of the major airlines. This is because both the competition from discount airlines and their own high costs were pre-9/11 conditions that the major airlines had failed to address.

71.    This is especially true for Delta, who, during the Class Period, obtained the dubious distinction of having the highest paid pilots in the industry despite its public statements that it was attempting to control/cut costs.

**Effects Upon The Other Airlines**

72.    In response to the new competitive market, including more influence from discount airlines and a lower number of air travelers, a number of the major airlines either filed for bankruptcy or threatened bankruptcy protection to garner concessions from their employees.

73.    Despite the problems besetting its competitors, Delta gave the appearance that it was still doing well. In April 2003, the Company launched another low-cost carrier, which it operated as a wholly owned subsidiary, called "Song," even though it already had a low-cost carrier in Delta Express.[4] The cost for launching Song was approximately $65 million.

74.    Moreover, according to a *New York Times* article, dated November 25, 2003, Delta stated that it did not need to threaten its employees with bankruptcy proceedings since it had a strong balance sheet and plenty of cash reserves. In particular, then Chairman and CEO,

---

[4] Delta Express was phased out as Song expanded the number of its daily flights.

Leo F. Mullin ("Mullin"), was quoted as saying that Delta was *"proceeding absolutely with the view that [they] did not have to utilize bankruptcy" protection.* (Emphasis added).

**Delta's Failed Cost Cutting Measures**

75.     Between 2001 and 2004, during which time it lost over $5 billion, Delta attempted to reduce costs by slashing its workforce by 16,000 employees.

76.     In the summer of 2003, Delta sent letters to its employees notifying them that the Company was cutting their pensions, in some instances upwards of $1,100 a month.  This was a mere eighteen months after the Company guaranteed full pensions for its top executives by committing $65 million to executive pensions in the form of "executive trusts."  CEO Mullin, who himself received an executive trust, later offered a "sincere apology" and said that the trusts "no longer appear appropriate."

77.     According to a *Wall Street Journal* article, published August 19, 2004, to help raise additional cash, in early 2004, Delta sold its fuel hedge portfolio, generating approximately $83 million.  Hedging programs help conserve an airline's resources since they lock in fuel prices at a given price.  Now, that Delta must buy fuel based on the open-market, Delta's fuel bill will now be at least $650 million more than last year's.

78.     By comparison, according to the Company's April 16, 2002 press release, the Company's fuel hedging program saved the Company $21 million in pre-tax dollars for the quarter.  Consequently, Delta's fuel costs are now its second-largest expense.

79.     In August 2004, Delta announced a series of programs designed to reduce costs. These were on top of the cost reduction programs that were announced in June 2003. Unfortunately, these initiatives failed to take any steps to protect the Plan's participants from the detrimental effects of Delta's disastrous decline.

**Rampant Evidence of Delta's Downward Financial Spiral**

80.     On November 14, 2000, the beginning of the Class Period, Delta filed its Form 10-Q for quarter ending September 30, 2000 with the SEC ("2000 3Q Form 10-Q").  Although the Company reported modest net revenue of $133 million, Delta also disclosed that, excluding unusual items, its net income for 2000 Q3 was actually lower than 1999's Q3.  The Company also reported marked increases in salary costs (16%) and fuel expenses (45%).  Notably, as described above, fuel costs are Delta's second largest expense.

81.     In a March 13, 2001 letter to investors and analysts, Delta disclosed that due to "a weakening economy and signs of customer avoidance related to a possible pilot strike," Delta expected to post a first quarter loss of $85 to $110 million.  The Company also said that it expected the weak economy and customer avoidance to adversely affect the Company's second quarter results as well and that Delta expected to lower revenues by approximately $200 to $250 million for that quarter.

82.     On June 15, 2001, Delta disclosed to investors and analysts that it expected to post a net loss of between $140 million and $160 million for the second quarter.

83.     On November 1, 2001, Delta issued a press release announcing its third quarter results.  In addition to being adversely affected by the terrorist attacks by approximately $400 million, Delta disclosed that it had already forecasted lower revenues due to increasing costs, a weak economy and the effects of the Comair pilots' strike.

84.     In a press release dated January 31, 2002, Delta disclosed its fourth quarter and full year 2001 results.  For the quarter, Delta lost $486 million, or $3.97 per share, and for all of 2001 Delta lost $1.0 billion.  Attempting to calm shareholders, including the Plan's participants,

Delta's then Chairman, Mullin, said, "Delta is extremely well-positioned to respond quickly and fully to the coming economic recovery."

85.     On April 16, 2002, Delta issued a press release summarizing its financial results for the first quarter. In pertinent part, the release stated that Delta reported a net loss, excluding unusual items, of $354 million or a loss per share of $2.90, up from its reported net loss of $122 million or $1.02 per share from the same time a year earlier. The release went on to quote Delta's Chairman and CEO, stating:

> **We continue to notice signs of gradual recovery**. We are focused on our recovery efforts and creating a more promising year in 2002. In the first three months of this year, **we saw our customers and revenue returning**, though revenues are recovering at a slower pace. There is still a long road ahead of us, but **Delta has the financial and operational strength to emerge from these tough times as a winner**. (Emphasis added).

86.     The Company's Chief Financial Officer at the time, M. Michele Burns, went on to state, **"Delta's recovery is on track and we are making progress**." (Emphasis added). He also stated that "in the month of March, Delta had positive cash flow from operations and we recorded an operating profit" and that the Company's financial strategy remained "focused on capacity discipline, cost containment and cash preservation."

87.     Despite these optimistic statements, Delta's operating revenues for the March 2002 quarter actually declined 19.3% from a year earlier. The results would have been even worse had the Company not filed and received its tax refund eight months ahead of schedule and taken advantage of the stimulus package passed by Congress which allowed the Company to extend its net operating loss carry back period to five years.

88.     Delta also reported losses for the second and third quarters of 2002, totaling over $488 million.

19

89.     On January 16, 2003, Delta issued a press release, which disclosed, in pertinent part, that the Company had lost $363 million for the quarter and $1.3 billion for the year.  Mullin blamed these poor financial results on "the post-9/11 industry turmoil and the slumping economy."

90.     The Company again reported a loss for the first quarter of 2003, totaling $466 million.

91.     On July 17, 2003, Delta reported a modest net income of $184 million.  However, the Company went on to state that excluding unusual expenses and government reimbursements, that Delta actually had a net loss of $237 million for the quarter.

92.     In response to the Company's spiraling financial problems, Delta's Board of Directors, effective July 2003, stopped making payments of quarterly cash dividends on the Company's common stock and suspended indefinitely the payment of dividends on the Company's preferred stock.  Notably however, upon information and belief, Defendants failed to take any meaningful ameliorative action to protect the Plan from its mounting losses.

93.     Illustrative of the fact that the Company's modest positive earnings in the second quarter were an aberration, Delta reported on October 14, 2003 another net loss for the quarter of $164 million.

94.     On November 12, 2003, the Company announced that its net loss for the fourth quarter would be as high as $415 million, **a 50.91% increase from its previously forecasted losses** of $275 million.  Delta attributed the increase to rising costs from retiring pilots.  From 2001 through the fall of 2003, the Company had lost over $2.49 billion.

95.    Also in November 2003, the Company announced that it would suspend preferred-stock dividends in its employee savings plans, due to the additional costs and loss. Delta said that it would pay these dividends at a later date.

96.    In November 2003, the Company's CEO, Mullin, abruptly announced that he was stepping down. Longtime Board member, Defendant Gerald Grinstein, replaced him in January 2004.

97.    In response to these events, in November 2003, Standard & Poor's ("S&P") placed the Company on its Creditwatch list, with negative implications, noting that its debt could be downgraded. S&P cited the Company's high costs, heavy pension obligations and continued losses as reasons for the placing the Company on the Creditwatch list. At the time, Delta had approximately $20 billion in debt and lease obligations.

98.    On January 14, 2004, Delta issued a press release disclosing its fourth quarter and year-end financial results. For the fourth quarter of 2003, Delta had a net loss of $327 million, or $2.69 per share. For the entire year, Delta reported losses totaling $773 million, or $6.40 per share. Further, Delta reaffirmed its "focus on cost containment . . ." In addition, the Company's new CEO, Defendant Grinstein, stated that Delta's **financial results are disappointing, especially given the expected performance of the other carriers**." (Emphasis added).

99.    In response to Delta's continuing downward spiral, in March 2004, the S&P downgraded Delta's debt rating.

100.    On April 14, 2004, Delta disclosed its first quarter results in a press release of $383 million in losses, or $3.12 per share. The press release quoted Defendant Grinstein as saying that "[c]**ontinued losses of this magnitude are unsustainable**. Delta must regain sustained profitability so we can compete effectively. The urgent task is to achieve a competitive

cost structure so that Delta can generate a positive cash flow, **reduce its debt burden** and return to profitability." (Emphasis added).

101.    On May 10, 2004, the Company disclosed that it might be forced to seek bankruptcy protection if it could not (i) reduce costs, (ii) curb losses, and (iii) raise capital. Delta also asked its only unionized workforce, its pilots, to take a 30% pay cut in order to help reduce costs.[5]

102.    According to a May 28, 2004 article appearing in the *New York Times*, Delta announced that it had hired the Blackstone Group, an investment bank, in preparation for its possible Chapter 11 filing.

103.    In July, Delta announced that it was now seeking wage and benefit concessions from the pilots' union totaling $1.02 billion a year. The Company also announced that it planned to create a new retirement plan for pilots, the highest-paid pilots in the airline industry.

104.    That same day, the S&P again downgraded Delta's debt and warned that another downgrade was possible since the Company's outlook remained negative. Prior to the downgrade, Defendant Grinstein admitted in a conference call with analysts that "**[t]he marketplace has changed, fundamentally and permanently**." The S&P warned that the restructuring of bond payments could trigger default status, which could then result in another downgrade to "default" status.

105.    Delta marked its 75th anniversary in June by having an abysmal quarter. Indeed, on July 19, 2004, Delta issued its most catastrophic quarterly results of the Class Period. For the second quarter alone, Delta reported a net loss of $1.96 billion, or $15.79 per share. The results, in short, were the worst results in a quarter-century for Delta.

---

[5] As previously stated, during this time, the Company had the highest paid pilots in the industry. This was especially troublesome for Delta since, on average, an airline's workforce costs represent approximately 40% of a company's total overhead.

106.    On August 5, Fitch Ratings ("Fitch") downgraded Delta's Senior Unsecured Debt to "CC." In a related move, the *Wall Street Journal* reported that eight days later, Fitch downgraded the Company's European Enhanced Equipment pass-through certificates due to questions regarding the collateral underlying certain of the Company's transactions and the Company's overall credit quality.

107.    According to an August 16, 2004 article in the *Wall Street Journal*, Defendant Grinstein wrote in a recent memo to its pilots that "**Delta, as it is now structured, cannot survive**." (Emphasis added).

108.    On August 19, 2004, the S&P further downgraded Delta's credit rating, sending it deeper into "junk" status with a rating of "CCC." Ominously, S&P signaled that there was a likelihood of further credit downgrades in the future.

109.    Indeed, the same August 16th *Wall Street Journal* article described Delta's problems succinctly when it stated:

> **Already in trouble before the Sept. 11 attacks and in a near free-fall since**, Delta has had losses of more than $5.6 billion over the past three years and racked up $20.6 billion in debt. If it keeps **burning through cash** at its current rate of more than $4 million a day, **it may be forced to file for bankruptcy in the fall** . . . (Emphasis added).

Unfortunately for the Plan's participants, the *Wall Street Journal* retrieved this analysis of Delta from the Company's own internal calculations.

110.    Because of all the foregoing factors, Delta's stock was decimated. Indeed, the stock suffered **a 92% drop in its value during the Class Period**. In the face of this collapse, Defendant-fiduciaries, upon information and belief, failed to protect the Plan. Consequently, the Plan, and the corresponding Plan's participants, lost hundreds of millions of dollars in retirement savings.

111.    Indeed, in the Company's Form 11-K filing for the period ending June 30, 2000 – which is just prior to the start of the Class Period -- the Delta Common Stock Fund alone held just under 8 million shares of Company stock and had a market value of over $404 million. By December 31, 2002, the same fund held over 14.8 million shares, but with a value of only $179.5 million. By December 31, 2003, the Delta Common Stock Fund had lost so much value that it did not even represent 5% or more of the Delta Plan's assets.

112.    In the face of this mountain of evidence that its stock was an imprudent investment, Defendant-fiduciaries took little or no action to protect the Plan from the massive losses it suffered during much of the Class Period.

**B.    Ameliorative Actions Are Too Little Too Late**

113.    Belatedly, in August 2004, Delta hired U.S. Trust Corp. ("U.S. Trust") – an independent financial adviser – to manage the Delta stock funds.

114.    By August 9, U.S. Trust determined that the prudent course would be to at least freeze the Delta Common Stock Fund, barring further investments into the Fund. In a letter to the Delta Plan participants, U.S. Trust cited "**the very serious financial difficulties**" and the "**widely recognized possibility of bankruptcy**" Delta faced in determining to bar further investments in the Delta Common Stock Fund. (Emphasis added).

115.    Further, U.S. Trust also disclosed that it was determining whether or not to freeze or terminate the ESOP fund in the Delta Plan. Unfortunately, this action was "too little too late" to protect the Plan from its significant losses.

**C.    Defendants Knew Or Should Have Known That The Delta Stock Was An Imprudent Investment For The Plan**

116.    At all relevant times, Defendants knew or should have known that Delta's business model was materially skewed by its failure to account for the growing number of and

effect from discount airline carriers and/or their inability to control costs. The effects of these failures made Delta stock an indisputably imprudent investment for the Plan. It is inconceivable that the high-ranking Defendants named in this complaint did not have personal knowledge of the true financial health of the Company and its bleak outlook throughout the Class Period.

117.    Defendants clearly failed to conduct an appropriate investigation into whether Delta stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Delta's true financial health, such that other fiduciaries and the Plan's participants could make informed decisions regarding Delta's stock in the Plan.

118.    All Defendants were aware, or should have been aware, of the serious financial problems facing Delta because of its growing debt, mounting losses and stiffer competition from discount airlines. By no later than November 14, 2000, Defendants knew that Delta's financial health threatened Delta's future, and that investing in Delta stock was highly risky.

119.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Delta stock, under these circumstances, was imprudent. A reasonably and prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

120.    Because Defendants knew or should have known that the Delta stock was not prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in the Delta Common Stock Fund and/or Delta stock. Defendants had available to them several different options for satisfying this duty, including: divesting the Plan of Delta

stock; discontinuing further Company-matching and participant-directed investment contributions in the Delta Common Stock Fund and/or Delta stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or, resigning as the Plan's fiduciaries to the extent that as a result of their employment by Delta they could not loyally serve the Plan's participants in connection with the Plan's acquisition and holding of Delta stock.

## CLAIMS FOR RELIEF UNDER ERISA

121. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

122. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

123. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

124. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

125.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

***duties of loyalty, exclusive purpose and prudence*** and are the "highest known to the law." They

entail, among other things,

> a.    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;
>
> b.    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;
>
> c.    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

126.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary,"

provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

127.    Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for

Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

**COUNT I**

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

128.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

129.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

130.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company stock.

131.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in Delta stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

132.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it

28

allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

133.     The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that Delta stock was not a suitable and appropriate investment for the Plan as described herein. Investment in Delta stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' savings. Despite all of this, these fiduciaries continued to offer the Delta stock as investment option for the Plan and to direct and approve the investment of the Delta Common Stock Fund in Delta stock, instead of cash or other investments. Similarly, at times during the Class Period, these fiduciaries permitted Company matching contributions to be made in Delta stock, including in the Delta ESOP Stock Fund. In so doing, Defendants further breached their fiduciary duties. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take *any meaningful* steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investment in the Delta stock and the Company's matching contributions in Delta stock. Further, given that such a high concentration of the assets of the Plan were invested in the stock of a single company – Delta -- Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments. All categories of Defendants failed to implement any such strategy.

134.     Moreover, the fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a

29

plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

135.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal the failure to prudently and loyally manage the Plan's assets with respect to offering Company stock as an investment option in the Plan; providing the Company matching contributions in Delta stock, despite knowing that such failure was a breach; enabling the Defendants' failure to prudently manage Plan assets with respect to the Plan's investments, including the match as a result of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

136.    Specifically, at least some of the Defendants had actual knowledge of the Company's precarious financial position and/or constructive knowledge of this condition due to their high-ranking positions at the Company. Despite this knowledge, they participated in each others' failure to prudently manage the Plan's assets and knowingly concealed such failures by not informing participants that the Plan's holdings of Delta stock were not being prudently managed. They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in Delta stock, despite inarguably having knowledge of such breaches.

137.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in Delta stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, the Defendants named in this Count enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in Delta stock.

30

138.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

139.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Monitor the Individual Defendants and
### Provide Them with Accurate Information
### (Breaches of Fiduciary Duties in Violation of ERISA § 404
### by Delta & Director Defendants)

140.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

141.    At all relevant times, as alleged above, Delta and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

142.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Delta and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.

143.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the Individual Defendants).  In this case, that means that the monitoring fiduciaries, Delta and the Director Defendants, had the duty to:

        (1)    Ensure that the Individual Defendants possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

31

(2)    Ensure that the Individual Defendants are provided with adequate financial resources to do their job;

(3)    Ensure that the Individual Defendants have adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the Individual Defendants have ready access to outside, impartial advisors when needed;

(5)    Ensure that the Individual Defendants maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the Individual Defendants report regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

144.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

145.    Delta and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries

32

completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company stock, an investment that was imprudent and subject to significant downward projections. Delta and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the Delta Common Stock Fund as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Delta Common Stock Fund in Delta stock when it no longer was prudent to do so. Despite this knowledge, Delta and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

146.    In addition, Delta and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the Individual Defendants accurate information about the financial condition of Delta that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

147.    Delta and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the Individual Defendants, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

148.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

149.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

150.    The Plan suffered a loss, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in Delta Stock during the Class Period in violation of the Defendants' fiduciary duties.

151.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class Period, unless the Plan satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

152.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plan.    In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

153.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Delta stock in the Plan.   Accordingly, participants failed to exercise the requisite independent control over their investment in Delta stock in the Plan.

154.    In addition, § 404(c) does not apply to any portion of the Plan deemed an ESOP

34

in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. *See* 29 C.F.R. § 2550.404c-1 (1996); *Herman v. Nationsbank Trust Co.*, 126 F.3d 1354, 1361 (11th Cir. 1997). Nor can § 404(c) apply to any losses that result from the Company's matching contributions in the Delta ESOP Stock Fund, as participants did not exercise any control over these investments.

155.    The Defendants' liability to Plaintiff for relief stemming from the Plan's imprudent investments in Delta Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## CAUSATION

156.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Delta stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's participants.

157.    Defendants are responsible for losses caused by participant direction of investment in the Delta Common Stock Fund and/or Delta stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants failed to apprise Plaintiff of the growing precarious financial state of the Company regarding the true health and ongoing viability of the Company, thereby misrepresenting its soundness as an investment vehicle. As a

consequence, participants did not exercise independent control over their investments in the Delta Common Stock Fund and/or Delta stock, and Defendants remain liable under ERISA for losses caused by such investment.

158.     Defendants are also responsible for all losses caused by the investment of the Plan's Company matching contributions in the Delta ESOP Stock Fund and/or Delta stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

159.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning the financial viability of the Company and the corresponding prudence of investment in the Delta Common Stock Fund and/or Delta stock, the elimination of the Delta Common Stock Fund and/or Delta stock as investment alternatives when they became imprudent, and the divesture of the Plan from the Delta Common Stock Fund and/or Delta stock when maintaining such investments became imprudent, the Plan would have avoided a substantial portion of the losses that they suffered through their continued investment in the Delta stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

160.     The Defendant-fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Delta equity.

161.     As a consequence of the Defendants' breaches, the Plan suffered significant losses.

162.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

36

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

163.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

164.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

165.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Delta maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Delta;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

38

I.      An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against the defendants.

DATED: September 3, 2004

                                                Respectfully submitted,

                                                HOLZER, HOLZER & CANNON, LLC

                                                By:_____
                                                    Corey Daniel Holzer
                                                    Ga. Bar No. 364698
                                                    Michael I. Fistel, Jr.
                                                    Ga. Bar No. 262062
                                                    1117 Perimeter Center W., St. E107
                                                    Atlanta, GA 30338
                                                    Telephone: (770) 392-0090
                                                    Facsimile: (770) 392-0029

                                                    Schiffrin & Barroway, LLP
                                                    Joseph H. Meltzer
                                                    Gerald D. Wells, III
                                                    Three Bala Plaza East, St. 400
                                                    Bala Cynwyd, PA 19004
                                                    Telephone: (610) 667-7706
                                                    Facsimile: (610) 667-7056